Filed 5/14/25  P. v. Lopez CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B336137 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA514608) |
| v. | |
| JEROME JERMAINE LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gustavo N. Sztraicher, Judge. Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Nicholas J. Webster and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant and appellant Jerome Jermaine Lopez sodomized an unhoused disabled woman one early morning as she sat at a bus stop on a busy intersection. Police officers on patrol at the intersection witnessed the assault in progress and arrested Lopez.

A jury convicted Lopez of sodomy and assault with intent to commit sexual penetration by force. The jury also found true the aggravating circumstance that the victim was particularly vulnerable. Premised on this aggravating circumstance, Lopez was sentenced to the upper term on the sodomy count. Lopez maintains that the trial court abused its discretion in imposing the upper term because there was insufficient evidence to support the finding, made by both the jury and trial court, that the victim was particularly vulnerable. We find that no abuse of discretion occurred and affirm.

# BACKGROUND

## I. Procedural Background

By information, Lopez was charged with two felony counts: (1) forcible sodomy (Pen. Code,[1] § 286, subd. (c)(2)(A)); and (2) assault with intent to commit rape, sodomy[2] and oral copulation (§ 220, subd. (a)(1)). As to both counts, the information specially alleged the offenses committed involved great violence (Cal. Rules of Court, rule 4.421(a)(1)),[3] and the victim was

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     The allegation of assault with intent to commit sodomy in count 2 was eliminated before the case was submitted to the jury.

[3]     "Rule" references are to the California Rules of Court.

particularly vulnerable (rule 4.421(a)(3)). Lopez pled not guilty and denied the special allegations.

Lopez was found guilty of both counts. With respect to the assault with intent to commit a felony, the jury found true that he intended to commit rape and sexual penetration by force. In a bifurcated hearing, as to both counts, the jury also found true the special allegation that the victim was particularly vulnerable (rule 4.421(a)(3)), but not that the offense involved great violence (rule 4.421(a)(1)). Lopez was sentenced to an aggregate prison term of 12 years, calculated as follows: the high term of eight years as to count 1, plus a consecutive midterm of four years for count 2. This timely appeal followed.

## II. Factual Background

### A. The Prosecution's Evidence

At about 8:00 a.m. on May 7, 2023, Los Angeles Police Department (LAPD) Officer Kasey Campbell and his partner, Officer Dominic D'Arcangelo were on patrol. As Officer Campbell drove, approaching the intersection of 54th and Normandie, he noticed "frantic motions" at a bus bench across the street. A man (Lopez) was standing behind a woman (the victim, T.P.) and making repeated thrusting motions toward her rear. T.P.'s pants were pulled down, exposing her buttocks and Lopez's hands were wrapped around her waist pulling her toward him.

Officer Campbell saw T.P. struggle, repeatedly "throwing an elbow" back in an effort to try to strike Lopez. T.P., who has limited mobility, tried to get away, but was only able to move forward two to six inches. Lopez grabbed her by the waist, pulled her back toward his pelvis and thrusted repeatedly again in the area of T.P.'s buttocks. Officer Campbell activated his patrol car lights and sirens to avoid oncoming traffic and intervene. As he

approached, he saw Lopez was still grabbing T.P. with both hands as she continued to try to escape. When Lopez saw the police car, he released T.P. and sat on the bus bench. T.P. sat on the same bench away from Lopez.

Officer Campbell ordered Lopez, who appeared to have his hands over his crotch to conceal his genitals, to stand up. Lopez "act[ed] confused," claimed he had done nothing and made the officer repeat his command multiple times. When Lopez did stand up, his erect penis protruded from the top of his pants; he pulled his waistband up to cover his penis. One still image taken from the patrol car's dashcam video showed Lopez standing with his penis visible. Another image showed T.P.'s exposed buttocks.

T.P. was crying, disoriented and spoke loudly. She thanked the officers repeatedly. She told them that Lopez was raping her, had raped her multiple times and had hurt her. Dashcam footage of the encounter was played for the jury, as was video from the officers' body cameras.

At the trial in September 2023, T.P. used a walker. Taking the stand, she cried, saying she was "a little upset" because the "whole ordeal [was] just a lot on [her] and [her] family," and she was "scared." T.P. testified she had used a walker for about a year and could not walk without it. She had not had a walker at the time of the assault because she had just been released from the hospital and thought she had been using crutches or a wheelchair.[4]

---

[4] Officer D'Arcangelo did not remember T.P. having a walker with her on the day of the incident. He had since seen her many times at the same intersection and had recently seen her using a walker. In his view, T.P. required more assistance to walk at trial than she had on the date of the incident.

T.P. said she had been living on the streets for about six months at the time she testified and had lived on the streets in May 2023. She usually stayed by her church at Normandie and Century where she felt safe but would go to Normandie and 54th Street to visit friends she had made while on the streets. If it was too late to take a bus, T.P. slept or stayed on a bench at the intersection of Normandie and 54th Street and had stayed there at times in May 2023. T.P. had seen Lopez near that intersection more than once and knew him by the name "Creep" or "Creepy."

T.P. testified that on the morning of May 7, 2023, she was at the bus bench for about 30 minutes before Lopez assaulted her. She had not been walking around because she could "barely get around anywhere." At about 7:45 a.m., Lopez sat next to T.P. on the bench, began groping her and told her repeatedly to suck his penis. When she refused, he called her "bitches." T.P. testified Lopez was "bothering [her] and pulling out his pee-pee." His fingers touched her "backside" (referring to her anus), before also touching her "pork chop" (vagina). Lopez "finger-bang[ed]" T.P. or tried to masturbate her with his fingers. She repeatedly told him, "[D]on't do that. Don't bother me. And don't put your hands on me." She said, "Please don't hurt me." When Lopez put his fingers "in [her] backside," she told him to leave her alone and stop putting his fingers in her anus. Lopez then pulled out "his thing" (penis) which he pushed "on her over and over." T.P. testified Lopez moved his penis "back and forth" on her "backside," (her "a-hole") and was "trying to put that thing and make it cum like that." She felt Lopez's "penis go inside of [her] butt cheeks." Lopez was "cursing and fussing," and inserted his penis into her anus a little bit. He told T.P. he would "get away" with what he was doing and that no one would put him in jail for it. T.P.

5

"squeez[ed]" to "keep [Lopez's penis] out" and tried to get away. His penis did not fit in T.P.'s buttocks, so he inserted it into her vagina.

T.P. testified she had been so afraid and upset she urinated on herself. She was unable to get away because Lopez was holding her, and she was "handicapped" and "[could] barely walk." When T.P. saw the patrol car, she told Lopez the police were there to which he responded, "I don't give a fuck." Although there had been heavy traffic at the intersection on the morning of the incident, "[n]obody cared" and "[n]obody stopped" to help T.P. until the police officers arrived. Officer D'Arcangelo testified that, despite heavy traffic at the intersection, no witness stopped to speak to the police about the attack, nor did anyone speak about it when he canvased the area and a nearby gas station for additional evidence.

On cross-examination, when T.P. was asked whether Lopez had not "enter[ed] [her] pork chop," she said "[w]ell, he was sure close to it. He was very close to it actually," and she had felt the warmth of his penis. When defense counsel asked again if Lopez's penis entered her anus, T.P. said, "It was definitely on it, yes. He had his penis on my body, yes." When asked if she had told the police officers at the time of the incident that Lopez had not entered her, she responded, "[she knew] that he did do that. And [she did] not like words to be put in [her] mouth. And [she knew] what he [did] to [her]."

At the time of the incident, T.P. had told the officers both that Lopez had not inserted his penis into her anus or vagina, and that she did not know if he had. When Officer D'Arcangelo asked T.P. whether Lopez fully entered "either one," T.P. had said "No," but then added "[m]inimally." She testified she had

6

been truthful when she spoke to the police officers. T.P. told the officers Lopez instructed her to go into an alleyway with him. She said Lopez pulled down her pants, bent her over and held onto her body.[5] He was trying to "do it" "[d]oggie-style to [her] back," by which she meant her anus, and said Lopez put "his thing in [her] ass," "in the back of [her] bootie," and inserted it "a little bit." Consistent with what she told the police officers at the time of the assault, T.P. testified Lopez raped her. T.P. also told the nurse who conducted her examination after the assault that Lopez tried to insert his fingers in her anus.

Officer D'Arcangelo testified it had been "difficult to interview" T.P. She appeared to have some "not mental illness, but a defect." She was very articulate one moment, and in the next "sp[oke] like a 10-year-old." Parts of the interview were easier to understand than others. During the interview, T.P. used "slang instead of detail," but it was clear to Officer D'Arcangelo that T.P. used the terms "back" to mean her "anus," and "pork chop" to refer to her "vagina."

The day after the assault, LAPD Detective Kristina Montoya interviewed T.P. at an emergency shelter. Detective Montoya testified T.P. was "a little in shock. Not sure what was going on," was "[v]ery emotional" and did not really understand who Detective Montoya was or what she asked her. Detective Montoya testified it was difficult for T.P. to articulate exactly what had happened. She was "kind of all over the place when [the

---

[5]     After viewing video of the incident at trial, T.P. recalled that Lopez had pulled her pants down while the two were at the bench, exposing her buttocks and part of her vagina; it embarrassed her.

detective] was asking her questions." Detective Montoya had spoken to T.P. a number of times since the assault. There were times during their conversations when T.P. was "very articulate" and "very funny," and others when T.P. seemed to zone out and did not understand the detective's directions or what she was being asked. When Detective Montoya asked T.P. specifically whether Lopez had been on her lower back or had penetrated her anus, T.P. ranted about something else.

T.P. told Detective Montoya that Lopez put "his thingy" "in [her] ass," and used the words "lower back" and "anus" interchangeably. At certain points in the interview, T.P. said there had been no insertion but also said Lopez had inserted his penis into her anus. T.P. was clear that there had been no insertion into her vagina. T.P. told Detective Montoya that she had felt "scared" and "kind of helpless" during the assault. The detective testified T.P. had not had a walker when she interviewed her but clearly had difficulty walking. T.P. required assistance to walk to and from her bed and downstairs. She had to hold onto something to walk from one point to another.

Following the assault, T.P. was taken to a rape treatment center for a sexual assault rape treatment test and DNA testing. Lopez was taken to the same treatment center for DNA testing. During T.P.'s sexual assault exam, sperm was detected on a perianal swab, and swabs of her external genitalia and mons pubis. Male DNA was detected on all swabs taken from T.P. Per agency protocol, DNA analysis was conducted on a single sample. The DNA analysis of the perianal swab, which contained the most sperm, showed a combination of two individuals; both Lopez

8

and T.P. were excluded as contributors.[6] All swabs contained male DNA, but these were not further tested.

During the exam, T.P. said she had injuries on her legs unrelated to the assault. Her pants were dirty and smelled of urine, and T.P. was tearful and complained of pain.  She told the nurse examiner Lopez's hands had been in her genital area, neck and buttocks during the assault. She stated his penis had been on her low back and in her anal/genital area. The exam revealed a fresh laceration on the area around T.P.'s anal opening, and the cut was consistent with anal penetration. The nurse examiner testified a laceration in the perianal area was unlikely to occur absent penetration.

## B.    Defense Evidence

Lopez did not present any witnesses.

## C.    Closing Argument

In closing argument at the first phase of trial, the prosecutor told the jurors that "throughout [T.P.'s] testimony [they] all should have understood that there is some kind of limitation." The prosecution also acknowledged the case might not have been prosecuted had police officers not witnessed the assault in progress, given that the only evidence came from the victim, an unhoused woman. "[T]hat's the harsh reality of the world that we live in, where we sometimes don't believe people off the streets, where people don't stop to help people that are being assaulted and violated in broad daylight at a public bus stop."

During closing argument in the second phase of trial as to the special allegations of aggravating circumstances, the prosecution argued that T.P. was particularly vulnerable based

---

[6]    The prosecution argued this was consistent with her testimony that he did not ejaculate.

on her unique characteristics. She had physical limitations and difficulty walking which contributed to her vulnerability and had tried to help herself but was unable to do so. The unusual circumstances of the crime also contributed to T.P.'s vulnerability as it was committed at 8:00 a.m. at a busy intersection. Under those very public conditions, T.P. could not have anticipated that someone would approach her, demand that she perform a sexual act, and violently grab her.

In its closing argument, the defense countered that T.P. was not particularly vulnerable, as she had not been "surprised out of her sleep," "isolated" or "grabbed from a public place say into an alley." In addition, defense counsel noted T.P. was neither elderly nor a child. Moreover, whatever medical conditions she had were unlikely to have been known by Lopez as he approached her sitting on a bench. Defense counsel observed a surprise attack was not tantamount to an attack on a particularly vulnerable victim, as "no one ever expects any sort of offense like this to happen."

As to the rule 4.421(a)(3) allegation, the court instructed the jury: "Particularly vulnerable includes being defenseless, unguarded, unprotected, or otherwise susceptible to [Lopez's] criminal act to a special or unusual degree. [¶] In determining whether [T.P.] was particularly vulnerable, you should consider all the circumstances surrounding the commission of the crime, including the characteristics . . . of [T.P.] and the manner and setting in which the crime was committed." The jury was further instructed that to find T.P. was particularly vulnerable within the meaning of the special allegation, it must unanimously find Lopez's "conduct was distinctly worse than an ordinary commission of the underlying offense." However, jurors need not

agree on which facts showed that T.P. was particularly vulnerable. The jury found true the special allegation that T.P. was particularly vulnerable as to both counts.

At sentencing, the court found the "facts [in this case] are terrible," and the prosecution had proven beyond a reasonable doubt Lopez "sodomized the victim in public, on a park bench, against her will." The court stated it had "observed [T.P.] testify," and noted she was transient, "appeared disabled" and "appeared particularly vulnerable." The sodomy had been committed by force and T.P. appeared "somewhat disabled." The court stated there was "no question in [its] mind that the high term on [the sodomy count was] appropriate" given its conclusion and the jury's finding that T.P. "was particularly vulnerable."

## DISCUSSION

## I. The Trial Court Did Not Abuse Its Discretion in Imposing the Upper Term Sentence on the Ground T.P. Was a Particularly Vulnerable Victim

Lopez contends the trial court abused its discretion in imposing the upper term as to the sodomy conviction because there was insufficient evidence to support the factual conclusion T.P. was a particularly vulnerable victim, within the meaning of rule 4.421(a)(3).

Lopez argues the court erred in imposing the upper term because, notwithstanding its reference to the fact T.P. appeared to have a physical disability, there was no evidence of the extent to which that disability was obvious at the time of the assault. T.P. testified that she used a wheelchair or crutches that morning, but neither officer saw a wheelchair or other assistive device. In addition, because T.P. sat on the bus bench for about 30 minutes before she was accosted, Lopez would not have been

11

aware of her mobility issues. He also maintains the fact the officers saw T.P. struggle with and "throw an elbow" at him is evidence she was not particularly vulnerable, but rather "able and willing to fight back." Lopez also contends there is no evidence he knew T.P. was an unhoused person, a fact noted by the court, or even if he had it would bear on the degree of her vulnerability. Finally, Lopez contends the trial court's reliance on its own observations and witness testimony that T.P. was particularly vulnerable due to her precarious mental state and inability to respond consistently or cohesively to questions, also was not a fact obvious to him at the time of the assault.

### A. Controlling Law and the Standard of Review

Effective January 2022, section 1170, subdivision (b) was amended making the middle term (here six years) the presumptive sentence. (*People v. Lopez* (2022) 78 Cal.App.5th 459, 464 (*Lopez*), disapproved on another ground by *People v. Lynch* (2024) 16 Cal.5th 730, 769.) For crimes to which a sentencing triad applies, "a trial court is free to base an upper term sentence upon any aggravating circumstance that (1) the court deems significant and (2) is reasonably related to the decision being made." (*People v. Moberly* (2009) 176 Cal.App.4th 1191, 1196; accord *People v. Sandoval* (2007) 41 Cal.4th 825, 848 (*Sandoval*), superseded by statute as stated in *Lynch*, at p. 757.) A single appropriate factor is a sufficient basis to support an aggravated term. (*People v. Castellano* (1983) 140 Cal.App.3d 608, 615; see also § 1170, subd. (b)(1)-(2); *Lopez*, at p. 464.)

If a sufficient basis is established to support a conclusion of at least one aggravating factor, the trial court enjoys broad discretion in its sentencing determination. (*People v. Catalan* (2014) 228 Cal.App.4th 173, 179.) In such cases, an appellate

12

court will set aside the sentencing decision only if it is "arbitrary, capricious, or so outside the bounds of reason as to render its ruling an abuse of discretion." (*People v. Thomas* (2023) 14 Cal.5th 327, 400; *Sandoval, supra,* 41 Cal.4th at p. 847.) The party challenging a sentencing decision bears the burden to establish that the trial court clearly abused its discretion. " ' "A merely debatable ruling cannot be deemed an abuse of discretion." ' " (*People v. Johnson* (2022) 12 Cal.5th 544, 605; *People v. Jennings* (2010) 50 Cal.4th 616, 639 [where circumstances justify findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding].)

For purposes of rule 4.421(a)(3), "particularly" has been interpreted to mean " ' "in a special or unusual degree, to an extent greater than in other cases" ' " and "[v]ulnerability" means " ' "defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." ' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 154 (*DeHoyos*).)

### B.   Analysis

We conclude the trial court did not abuse its discretion in imposing the upper term sentence on the sodomy count, premised on its finding that T.P. was "particularly vulnerable." (Rule 4.421(a)(3).) Contrary to Lopez's assertion, being "particularly vulnerable" is not limited to victims who are hidden from view, young or who have a preexisting subordinate relationship to the perpetrator. " ' "[P]articular vulnerability" is determined in light of the "total milieu in which the commission of the crime occurred. . . ." ' " (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1321 (*Weaver*), disapproved on another

13

ground by *People v. Cook* (2015) 60 Cal.4th 922, 939.) A victim who is isolated and separated from others who could help is particularly vulnerable. (*People v. Ramos* (1980) 106 Cal.App.3d 591, 607 (*Ramos*) [victim alone in single room trailer was particularly vulnerable due to isolation and not being "subject to help from individuals who were passing by"], disapproved on another ground in *People v. Scott* (1994) 9 Cal.4th 331, 353, fn. 16, 356.)

In terms of the " ' "total milieu" ' " of the crime, here the assault occurred just before 8:00 a.m. at a busy intersection in full view of the public—indeed, in full view of the police officers who interceded. T.P. testified "a lot" of people were "coming up and down the street" as Lopez groped her, yet "Nobody cared. Nobody stopped." The fact no one was willing to assist T.P., a transient, disabled and not entirely lucid individual, rendered her isolated just as effectively as if she had been alone in a nearby alley.

The court's finding T.P. was particularly vulnerable was reasonable and within its discretion. The crime involved a completely unexpected, violent physical assault at a busy location in broad daylight. T.P., who had just been released from the hospital, was sitting on a bus bench because she could "barely get around." Lopez approached her, demanded she perform oral sex on him and, when she refused, pulled down her pants and brutally assaulted her. Lopez was much stronger than T.P., who tried uselessly to fight him off by throwing back her elbows and futilely tried to escape by taking the few tentative steps her physical incapacity permitted before he wrenched her back and continued an assault so rough it caused a tear in the area around her anus. T.P. was so afraid she urinated on herself.

In addition to her physical disability, the court and witnesses observed that T.P. appeared to suffer some cognitive impairment. According to Officer D'Arcangelo, T.P. was "difficult to interview," vacillating between being articulate, then suddenly "speaking like a 10-year-old." Similarly, Detective Montoya testified that, when she interviewed the victim the day after the assault, T.P. again vacillated between being "very articulate" then seeming to "zone out," and unable to understand the detective's questions or directions. Based on this evidence and its own observations, the trial court found that T.P., a forcibly sodomized transient, "appeared disabled," and "particularly vulnerable," and concluded there was "no question in [its] mind that [the] high term on [the sodomy] count [was] appropriate."

Lopez, in turn, presented no evidence that would mitigate the court's conclusion. Instead, he tries to minimize the conclusion T.P. was particularly vulnerable by pointing to the fact the assault took place in broad daylight at a busy intersection. This evidence does not advance his case. Sadly, the facts showed no one travelling in the area cared enough to stop to help a disabled transient. As T.P. said, "Nobody cared. Nobody stopped." Indeed, Lopez clearly attempted to capitalize on this harsh reality when he told T.P. he would "get away" with the assault, he did not "give a fuck" police officers had arrived in the middle of his attack, and he would not be prosecuted for his crimes. Lopez also asserts there is no evidence he knew about T.P.'s physical or mental limitations. He is mistaken. T.P. had been living on the streets for about a month before the assault and was regularly in the area where the crime occurred. She had seen Lopez more than once in that area and knew him by his nickname. Thus, it may reasonably be inferred that Lopez

15

similarly had some familiarity with T.P., and would have been aware that she was unhoused, disabled and vulnerable. Indeed, even if he had not known this information beforehand, at the time of the assault, Lopez clearly took full advantage of the fact that T.P.'s vulnerability and physical limitations prevented her from escaping or defending herself against his attack. (See *DeHoyos*, *supra,* 57 Cal.4th at p. 154 [vulnerability means "defenseless, unguarded, unprotected, accessible, assailable"]; *People v. Smith* (1979) 94 Cal.App.3d 433, 436 [in football jargon, an attack on a particularly vulnerable victim is "a cheap shot"].)

Viewing the record in the light most favorable to the judgment and considering the evidence in " ' "the total milieu in which the commission of the crime occurred" ' " (*Weaver, supra*, 149 Cal.App.4th at p. 1321), and according due deference to the trier of fact, we have no difficulty concluding that substantial evidence supports the jury's true finding as to the aggravating circumstances and the trial court's corresponding decision to impose the upper term based on its conclusion that T.P. was a particularly vulnerable victim. (See, e.g., *Ramos, supra,* 106 Cal.App.3d p. 608 [trial court's finding of vulnerability was "wholly proper" where victim was alone at home, surprised by the sudden assault, and where the "likelihood of gaining help from other individuals or fleeing from the scene was greatly diminished"].)

## DISPOSITION

The judgment is affirmed.


RICHARDSON, J.

WE CONCUR:


ASHMANN-GERST, Acting P. J.


CHAVEZ, J.